[Civ. No. 15274. First Dist., Div. Two. June 2, 1953.]

MARJORIE DEES, Respondent, v. JOSEPH PACE, Appellant.

Rank, Oneal, Luckhardt, Center & Hall and Duncan Oneal for Appellant.

O. Vincent Bruno and Michael Di Leonardo for Respondent.

PATTERSON, J. pro tem.—This is an appeal from a judgment against defendant, a physician and surgeon, for the sum of $20,000 entered pursuant to a jury's verdict awarding the plaintiff that sum in damages for malpractice.

The defendant performed a total hysterectomy operation upon the plaintiff. After the operation plaintiff developed a leakage of urine. Plaintiff testified that this first occurred while she was in the hospital three days after the operation. It was reported to the doctor 10 days after the operation. She reported from time to time to the doctor and received some treatment without effect. She was examined by another physician, a Dr. Lamb, with the consent of the defendant. Dr. Lamb discovered a fistula or hole in plaintiff's bladder. The plaintiff returned to the defendant who made an examination and also found the fistula. Plaintiff entered the hospital

again, and another operation was performed to repair the bladder. This operation was performed by an urologist, Dr. McElligott, who was assisted by the defendant. The condition was no better after this operation. Another repair operation was performed, this time by Dr. Picksworth and Dr. McElligott. This operation was successful and plaintiff no longer had any leakage.

Three doctors testified on behalf of the plaintiff. Dr. Lamb testified as to his examination of the plaintiff, the finding of the fistula, and that he informed the defendant of his findings. He further testified that a fistula of this kind could have been caused by a cut from a scalpel during an hysterectomy operation, from the use of scissors, from clamps improperly placed, or by infection which had cut off the blood supply from that portion of the bladder. He stated that a fistula had never followed any of the approximately 300 hysterectomies he had performed. The doctor also testified that if the fistula had been caused by cutting the wall of the bladder during the operation, leakage would be expected to appear almost immediately and in any event sooner than 10 days. He expressed no opinion as to how the fistula in the present case was caused.

Dr. E. B. McElligott, who performed the first repair operation and who assisted in the final repair operation, testified he found no disease or anything unusual in the bladder which would cause it to break down but stated he had no opinion as to the cause of the fistula. He testified that a fistula could be caused by a suture in the bladder, by cutting, by clamping, by poor blood supply, by infection, by childbirth, or that it could result from pressure against the bladder by an enlarged uterus. He also testified that in performing an hysterectomy you separate the bladder from the uterus by use of your fingers and a sponge which is considered good procedure; that it is possible that a bruise could result to the bladder during the course of that phase of the operation which in turn could develop a fistula. He stated that a fistula developing from an hysterectomy is not too uncommon.

Dr. Harry Luke Harrison, Jr., testified that he is a specialist in the field of obstetrics and gynecology; that in his entire practice he had observed approximately two dozen fistulas; that only in one-tenth to two-tenths of one per cent of all hysterectomies does a fistula follow. He examined the plaintiff and observed the fistula but expressed no opinion as to its cause.

The plaintiff, in rebuttal, called Dr. Max E. Picksworth who testified that he performed the second repair operation with Dr. McElligott and that plaintiff's fistula was about one to one and one-half centimeters in diameter. The fistula in his opinion was possibly of traumatic origin. He further testified that in his opinion it could not be due to a condition of chronic cervicitis. There was also testimony by the doctor that fistulas sometimes result from cancer and in inflammatory disease in other organs that extend to the bladder.

None of the doctors called by the plaintiff criticized in any manner the operative procedure followed by the defendant. None of them expressed a view that the facts evidenced any failure by the defendant to possess the degree of learning and skill ordinarily possessed by physicians in good standing practicing in the locality. Neither did any of them suggest that the facts indicated any failure to exercise due care in applying that knowledge and skill in the treatment of the plaintiff.

The defendant called three doctors as witnesses. The first was Dr. John Hunt Shephard who testified he had examined the operative records of the hospital concerning the procedure followed by the defendant in performance of the operation and that there was nothing which would have been done differently by any prudent surgeon of general practice and that the defendant had not failed to do anything which should have been done by a reasonably practical and skillful surgeon in the area. He further testified that a possible fistula is a recognized hazard in hysterectomies and that a fistula may develop from the performance of an hysterectomy without negligence on the part of the doctor. A fistula had never followed any of the hysterectomies that he had performed although he stated that they sometimes follow such an operation and one sees many of them in medical centers. In his opinion the incidence would be less than one per cent. Dr. Shephard also stated the causes of vesicle vaginal fistulas following a total abdominal hysterectomy are congenital defects in the bladder, the use of instruments, suturing, infections or tumor formations.

Dr. Thomas L. Blanchard testified that he had examined the operative routine and there was nothing in the record which differed from the manner in which such an operation would be performed by a reasonably prudent and skillful surgeon. He further testified that a fistula in the bladder might

follow an hysterectomy performed under ideal conditions and by the most skillful surgeon.

Dr. Pace, the defendant, after describing his treatment and operative procedure, stated that so far as he could ascertain he did not cause any injury to the plaintiff's bladder by the use of scalpel, scissors, clamps or in suturing. He stated that removal of the uterus disclosed the presence of two cysts, a fibroid and chronic cervicitis. The uterus was found to be enlarged. The causes of fistula following hysterectomy were stated to be: lacerations of the bladder with a knife, scissors or needle; undue pressure or extension on the bladder during the operation; infections, present or previous; poor blood supply and causes inexplainable to the surgeon. He stated that a fistula was a calculated risk in this type of operation and further stated he did not know its cause in the present case. His testimony also disclosed that the upper portion of the uterus is about one inch from the wall of the bladder and the lower portion is next to the wall of the bladder.

The defendant complains first that the court erred in giving instructions on the doctrine of res ipsa loquitur. The court gave an instruction which explained the essentials of the doctrine of res ipsa loquitur and further instructed that from the happening of the injury involved in this case there arose an inference that there was some negligent conduct on the part of the defendant.

The facts here are similar to those in *Farber* v. *Olkon,* 40 Cal.2d 503 [254 P.2d 520], and *Engelking* v. *Carlson,* 13 Cal.2d 216 [88 P.2d 695]. In the Farber case, decided since this case was submitted, the Supreme Court had occasion to state again the rule regarding the doctrine of res ipsa loquitur in malpractice cases. In that case the plaintiff suffered a fracture of both femur bones in the course of shock treatment in a mental institution. From the expert testimony it appeared that this result was one of the hazards of such a treatment although the overall incidence of fractures in such cases was only from one-half to three and one-half per cent. In holding that res ipsa loquitur did not apply the court said, ''That doctrine applies in medical malpractice cases only where a layman is able to say as a matter of common knowledge and observation, or from the evidence can draw an inference, that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'' In *Engelking* v. *Carlson, supra,* the defendant in the performance of a knee operation severed

the paroneal nerve resulting in a disability to the plaintiff. The defendant testified that although the nerve is not difficult to locate and identify a surgeon may miss it and thereby cause injury. He also testified that although severance of this nerve did not ordinarily occur it was one of the hazards of this kind of an operation. Other medical testimony was to the effect that in ordinary surgical practice it occurred in from five to nine per cent of the cases. The court held that the doctrine of res ipsa loquitur did not apply.

■ An hysterectomy operation as disclosed by the medical testimony is a complicated one and it would lie beyond the realm of the common knowledge and experience of laymen .as to whether or not this result would ordinarily occur in the absence of negligence. None of the doctors testified that in the small number of cases in which fistulas occur they are probably the result of negligence. On the contrary the undisputed expert testimony shows that a fistula is a recognized hazard in all hysterectomies, one of the calculated risks; and while it does not occur very often from any cause, it may occur where the operation is performed under ideal conditions by the most skillful surgeon without negligence on his part.

The plaintiff contends that the doctrine of res ipsa loquitur is applicable in this case in view of the testimony of Dr. Lamb and Dr. Shephard that in the many hysterectomies performed by them no fistulas had resulted, and also in the testimony of Dr. Harrison and Dr. Shephard that the incidence of the fistulas in such cases is small. ■ The mere fact in itself that an unfavorable result is somewhat rare does not give rise to such an inference. The court refused to invoke the doctrine in *Farber* v. *Olkon, supra,* and *Engelking* v. *Carlson, supra,* where the incidence was small.

Plaintiff next contends that the instructions are within the spirit of the holding of *Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]. In that case a patient in a hospital undergoing an appendectomy received injuries to his shoulder due to trauma. The court there pointed out that the patient received ''a distinct injury to a healthy part of the body not the subject of treatment nor within the area covered by the operation.'' The court stated that the injury was obviously the result of someone's negligence. In the present case, however, the area affected was within the operating field and was a recognized hazard of such an operation.

Plaintiff also contends that under the authority of *Milias* v. *Wheeler Hospital,* 109 Cal.App.2d 759 [241 P.2d 684] the question of whether or not the doctrine of res ipsa loquitur should be applied is one which should be submitted to the jury. ■ The court there, however, pointed out (p. 764) that "one of the basic facts that the plaintiff must prove before the doctrine is applicable is that the occurrence is one that ordinarily does not happen unless there was negligence." There is no testimony in the record here, either expert or otherwise, that would support the submission of such an issue to the jury.

■ The plaintiff also relies upon testimony given by her regarding a conversation with the defendant following the discovery of the fistula. She testified that the doctor stated "we all make mistakes" and said he had made a mistake. She further testified that the defendant said that "most probably" the needle went through a portion of the bladder in sewing the incision between the bladder and the uterus and that subsequently it broke out tearing a hole in the bladder. The defendant denied that any such conversation occurred. If this could be construed as an admission of negligence it would be evidence of a specific act of negligence and would not afford a basis for the giving of instructions on res ipsa loquitur.

■ Defendant complains that the court erred in giving res ipsa loquitur instructions together with instructions concerning presumption of care. It was held in *Scott* v. *Burke,* 39 Cal.2d 388 [247 P.2d 313] that there is no impropriety in giving both of these instructions where both are applicable.

For the reasons above stated the judgment is reversed.

Dooling, J., concurred.

NOURSE, P. J.—I dissent.

The evidence of defendant's negligence is irrefutable and the jury's verdict rests on that evidence, uninfluenced, I believe, by any hypercritical theories of judicial platitudes. Hence this court cannot say that the instruction on the res ipsa loquitur doctrine was prejudicial.

But I am not satisfied that it was error. All the medical testimony showed that a fistula in the bladder caused by an hysterectomy operation was a very, very rare occurrence. One expert testified that in only one-tenth to two-tenths of one per cent did it happen. One testified that the incidence

would be less than one per cent. One testified that a fistula had never happened in the approximately 300 hysterectomy operations performed by him. It is not reasonable in view of this evidence for this court to say that such injury was an assumed risk, or one that would have ordinarily occurred.

Furthermore I believe that the res ipsa instruction was properly given. Both *Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258] and *Farber* v. *Olkon,* 40 Cal.2d 503, 510 [254 P.2d 520], adhere to the rule that the instruction is properly given where, from the facts in evidence, the jury could draw the inference that the injuries "were not such as ordinarily would have followed if due care had been exercised. . . ." Where the undisputed testimony shows that a fistula would not be expected in more than one-tenth of one per cent of such operations and, in the practice of one of the witnesses, had not occurred in more than 300 of such operations, the jury might well have concluded that the injury here was one that would not have *ordinarily* followed if due care had been exercised.

A petition for a rehearing was denied July 2, 1953, and respondent's petition for a hearing by the Supreme Court was denied July 28, 1953.